UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| JONI FONTENOT | * | CIVIL ACTION NO. 2:16-CV-84 |
| | * | |
| v. | * | |
| | * | JUDGE BROWN |
| SAFETY COUNCIL OF SOUTHWEST | * | |
| LOUISIANA | * | |
| | * | MAGISTRATE JUDGE KAY |
| | * | |
| | * | |

**********************************************************************

### ORDER

Before the Court is Defendant Safety Council of Southwest Louisiana's ("Safety Council") "Motion in Limine to Exclude the Opinions and Testimony of Israel Lowery."[1] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court will grant in part to the extent the Court will exclude any testimony which renders conclusions of law by Israel Lowery ("Lowery") and deny the motion in all other respects.

### I. Background

*A. Factual Background*

Safety Council is a non-profit 501(c)(3) organization dedicated to cost effective services for Southwest Louisiana industrial and contractor businesses.[2] Joni Fontenot ("Fontenot") is a female employed by Safety Council in the position of the Chief Operating Officer ("COO").[3] Fontenot began in this position upon entering into a three-year employment contract on October 19, 2011.[4] The terms of the agreement ("Fontenot's Employment Contract"), including

---

[1] Rec. Doc. 52.

[2] Joint Pretrial Statement (Rec. Doc. 101) at 2.

[3] *Id.* at 2–3.

[4] *Id.* at 2.

1

compensation and duties, are memorialized in the contract.[5] Fontenot was offered a starting salary of $95,000.[6] Fontenot's Employment Contract was renewed for an additional three years on October 19, 2014, when neither party issued a statement of non-renewal under the terms of the contract.[7] Prior to Fontenot's employment as COO, Robert J. McCorquodale ("McCorquodale") served as Chief Executive Officer ("CEO") of Safety Council from 2005 to 2011.[8] McCorquodale's 2005 employment contract ("McCorquodale's Employment Contract") set his base salary at "$89,426.53 to be increased by 3% January 1[,] 2005 and each January 1st thereafter by a minimum of 3% up to 6% depending on the financial condition of the Safety Council upon approval by the President of the Executive Board."[9] In 2010, McCorquodales' W-2 reflected that he earned $165,431.37.[10] Safety Council asserts that McCorquodale resigned in 2011 after Safety Council discovered that McCorquodale had been paying himself amounts that were not approved or authorized by Safety Council.[11]

## B. *Procedural Background*

Fontenot filed suit against Safety Council on January 19, 2016, alleging that Safety Council paid her differently than her male predecessor in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1), and that Safety Council retaliated against her after she complained of discrimination.[12]

---

[5] *Id.* at 2–3.

[6] *See* Rec. Doc. 33 at 4; Rec. Doc. 27-2 at 11.

[7] Joint Pretrial Statement (Rec. Doc. 101) at 3.

[8] *Id.* at 2.

[9] McCorquodale's Employment Contract (Rec. Doc. 27-13) at 2.

[10] Rec. Doc. 27-8.

[11] Joint Pretrial Statement (Rec. Doc. 101) at 2.

[12] *Id.* at 3.

2

On June 28, 2017, the Court granted Fontenot's motion for partial summary judgment, finding that Fontenot had proved a *prima facie* case of wage discrimination under the EPA.[13] On July 7, 2017, Safety Council filed the instant *Daubert* motion.[14] Fontenot filed an opposition to the motion on July 21, 2017.[15] With leave of court, Safety Council filed a reply on July 25, 2017.[16]

## C. *Expert Report of Israel Lowery*

Safety Council's *Daubert* motion seeks to exclude the expert report and testimony of Fontenot's expert witness, Lowery, a CPA.[17] In his report, Lowery calculates the difference between what Fontenot was actually paid and what McCorquodale might have been paid under four scenarios:

> Scenario 1: Lowery forecasts what McCorquodale might have been paid for the years 2011 through 2017 based on a model projecting future salary increases that were "similar to previous increases" for the years 2005 through 2010 as reflected on McCorquodale's W-2s and Safety Council's Form 990s.[18]
>
> Scenario 2: Lowery forecasts what McCorquodale might have been paid for the years 2011 through 2017 based on a model projecting future salary increases that followed a 6% annual increase from the year 2010 pursuant to the provision in McCorquodale's Employment Contract that provided a raise up to that amount based on the financial condition of Safety Council.[19]
>
> Scenario 3: Lowery forecasts what McCorquodale might have been paid for the years 2011 through 2017 based on a model projecting future salary increases that followed a 6% annual increase from the year 2005 pursuant to the provision in McCorquodale's

---

[13] Rec. Doc. 49 at 24.

[14] Rec. Doc. 52.

[15] Rec. Doc. 77.

[16] Rec. Doc. 94.

[17] Rec. Doc. 52.

[18] Expert Report of Israel Lowery (Rec. Doc. 52-2) at 3 (hereinafter "Lowery Report").

[19] *Id.* at 4–5.

3

> Employment Contract that provided a raise up to that amount based on the financial condition of Safety Council.[20]
>
> Scenario 4: Lowery averages the actual gross pay of McCorquodale in 2010 and Fontenot in 2011 and forecasts an annual increase of 6% for that average through 2017.[21]

Under all scenarios, Lowery also calculates the respective values of the employer benefit of a 6% of gross payroll matching contribution to the employer retirement plan.[22]

Lowery also compiles the gross income of the top executives at three other safety councils that he contends are similar in terms of geography and revenue for the years 2014 and 2015.[23] Lowery compared these amounts with what Fontenot was paid during those years, as well as the projections he calculated under the four scenarios "to ensure that [his] projections are reasonable for the industry."[24] Lowery relied on Treasury Regulation § 53.4958-6(a) (the "Treasury Regulation") for the proposition that such a comparison was appropriate.[25]

## II. Parties' Arguments

### A. Safety Council's Arguments in Support of the Daubert Motion

Safety Council moves the Court to exclude Lowery's opinions and testimony as irrelevant and based upon false assumptions that are unsupported by facts of the case.[26] Safety Council alleges that Lowery's opinions regarding pay rates at entities other than Safety Council and his

---

[20] *Id.* at 6.

[21] *Id.* at 8.

[22] *Id.* at 2.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] Rec. Doc. 52 at 1.

4

reliance on the Treasury Regulation are irrelevant to an EPA claim.[27] Safety Council also contends that Lowery's opinions regarding projected pay rate scenarios for Fontenot and McCorquodale are irrelevant because they are based on false assumptions that are unsupported by the record.[28]

### 1. Pay Rates at Other Entities

Safety Council claims that Lowery's opinions regarding pay rates at entities other than Safety Council are irrelevant to Fontenot's EPA claim and, therefore, should be excluded.[29] Safety Council asserts that the only pay disparity at issue in an EPA claim is that between employees of the same employer, and therefore, the salaries of employees at other institutions are irrelevant.[30] Safety Council claims Lowery relied on a "mischaracterization" of Treasury Regulation § 53.4958-6(a) to justify his references to pay rates at other entities.[31]

In Lowery's expert report, Safety Council contends that Lowery mischaracterized the Treasury Regulation as establishing a "generalized standard for determining a 'reasonable' executive compensation rate,"[32] when he stated the following in his expert report:

> [The] IRS recommends in Treas. Reg. § 53.4958-6(a) that nonprofits follow its three-step process to determine whether executive compensation is reasonable, one step of which is to obtain appropriate data as to comparability with other nonprofits with similar missions and similar budgets that are located in a similar geographic area.[33]

---

[27] Rec. Doc. 52-1 at 15.

[28] *Id.* at 16.

[29] *Id.* at 11.

[30] *Id.* (citing 29 U.S.C. § 206(d)(1)).

[31] *Id.* at 11–12 (citing Deposition of Israel Lowery (Exh. 2) at 34, 37 (hereinafter "Lowery Deposition"); Lowery Report (Exh. 1) at 2).

[32] *Id.* at 12 (citing Affidavit of Betty Raglin attached to Lowery Deposition (Exh. 2) at Exh. 4).

[33] *Id.* (quoting Lowery Report, (Exh. 1), at 2).

5

However, Safety Council asserts that the Treasury Regulation that Lowery cites, titled "Rebuttable Presumption that a Transaction is not an Excess Benefit Transaction," instead relates to considerations of whether an employee of a tax-exempt organization is being paid excessive benefits.[34] Safety Council contends that Lowery "conceded" that the regulation was inapplicable to this case and that the issues in this case do not involve an excess benefit transaction.[35] Therefore, Safety Council asserts, the Treasury Regulation is irrelevant.[36] Safety Council thus argues that the Court should exclude Lowery's opinions as to the Treasury Regulation and pay rates at other entities because they are not relevant to this case and will not assist the fact finder to understand the evidence or determine a fact in issue.[37]

## 2. Pay Scenarios

Safety Council argues that the four "pay scenarios" that Lowery projects in his expert report are irrelevant because they are based on false assumptions that are unsupported by the record.[38] In the first, second, and fourth pay scenarios, Safety Council contends that Lowery assumes that McCorquodale's 2010 pay, as reflected on his W-2 and Safety Council's Form 990, was approved and that similar increases would be approved.[39] Safety Council contends that these pay scenarios are based on a fiction, because Safety Council alleges that it is undisputed, and that Lowery acknowledged he had no evidence to dispute, that McCorquodale's 2010 pay was not

---

[34] *Id.* at 12–13 (citing 26 C.F.R. §§ 53.4958-6, 53.4958-4).

[35] *Id.* at 13, 15.

[36] *Id.* at 15.

[37] *Id.*

[38] *Id.* at 15–16.

[39] *Id.* at 16, 20, 22.

6

approved by Safety Council.[40] In the second, third, and fourth pay scenarios, Safety Council argues that Lowery's assumption of a 6% annual pay rate increase is not based in fact, because Lowery acknowledged that Fontenot's Employment Contract did not include an "automatic raise provision" and that Safety Council never approved a pay increase.[41]

Safety Council argues that Fontenot is attempting to use "artificially high" pay rate assumptions that are not based on the factual record in order to create false and misleading amounts for the jury to consider on the issue of damages.[42] Safety Council claims there is no basis in the record for Lowery to calculate pay scenarios based on McCorquodale's salary reflected on his 2010 W-2 and Safety Council's Form 990 because they do not reflect his correct, approved salary and correct rate of pay increases.[43] Therefore, Safety Council argues, Lowery's expert report and testimony regarding the pay scenarios should be excluded, because they are based on irrelevant information and false factual assumptions.[44] As such, Safety Council asserts, the pay scenarios cannot be helpful to the jury but would only cause confusion.[45]

## B. *Fontenot's Arguments in Opposition to the* Daubert *Motion*

### 1. Pay Rates at Other Entities

In opposition, Fontenot claims that Lowery is not using a comparison of the top executive salaries at other entities to prove Fontenot's claim of a pay disparity, but instead to ensure that the

---

[40] *Id.* at 16–19 (citing Lowery Deposition (Exh. 2) at 33, 36).

[41] *Id.* at 20, 21, 22 (citing Lowery Deposition (Exh. 2) at 60).

[42] *Id.* at 22.

[43] *Id.*

[44] *Id.* at 23.

[45] *Id.*

7

projections he made regarding McCorquodale's future pay were reasonable for the industry.[46] Fontenot asserts that the Treasury Regulation referenced by Lowery is used to determine whether compensation for a particular position is unreasonably high by comparing it to compensation at similar organizations.[47] Fontenot claims that Lowery calculated the projections of McCorquodale's pay using Safety Council's records and financial data, and then compared his results to what top executives made at other entities to ensure that his projections were reasonable.[48] Fontenot further claims that Lowery's reference to the Treasury Regulation was only to report his rationale for using the comparison method as his check for reasonableness.[49]

### 2. Lowery's Pay Scenarios

Fontenot contends that Safety Council suggests that when considering damages, the jury should consider the payments Safety Council intended to pay McCorquodale instead of the amounts that Safety Council actually paid McCorquodale.[50] Fontenot cites 29 C.F.R. § 1620.10 for the proposition that, under the EPA, "wages" generally include all payments made to an employee as remuneration for employment.[51] Fontenot further asserts that an employer subject to the EPA is required to keep records relating to, *inter alia*, the payment of wages and wage rates.[52]

---

[46] Rec. Doc. 77 at 1 (citing Lowery Report (Exh. 1) at 2).

[47] *Id.* at 3 (referencing "Instructions for Form 1120S" and the "Reasonable Compensation Job Aid for IRS Valuation Professionals").

[48] *Id.*

[49] *Id.*

[50] *Id.* at 5.

[51] *Id.*

[52] *Id.* at 6 (citing 29 U.S.C.A. § 211; 29 C.F.R. § 1620.32).

8

Fontenot claims that Safety Council alleges that it failed to maintain accurate records, but asserts that a jury's calculations of back pay should be reasonable and supported by the evidence presented in the record, and that all uncertainties should be resolved against the discriminating employer.[53] Fontenot argues that the assumptions that Safety Council challenges are derived from the actual wages shown by Safety Council's records.[54] Fontenot further argues that the percentage growth that Lowery uses in his projections is also derived from Safety Council's records.[55] Fontenot claims that none of the projections are based on payments that are higher than what he derived from Safety Council's records.[56]

Fontenot asserts that Safety Council paid McCorquodale the wages used by Lowery to make the projections in the expert report, because Safety Council had the responsibility to approve McCorquodale's pay and failed to prevent McCorquodale from giving himself payment increases.[57] Fontenot further argues that McCorquodale claims that Safety Council knew of his payment increases.[58] Moreover, Fontenot claims that the presumption should be that Safety Council's records are accurate.[59] Fontenot argues that Lowery relied on evidence in the record as to payments made to McCorquodale and that Lowery is not required to make factual

---

[53] *Id.* at 8 (citing *Lowe v. Southmark Corp.*, 998 F.2d 335, 337 (5th Cir. 1993)).

[54] *Id.* at 7.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

9

determinations pertaining to Safety Council's records.[60] For these reasons, Fontenot argues the motion should be denied.[61]

## C. *Safety Council's Arguments in Further Support of the Daubert Motion*

### 1. Pay Rates at Other Entities

In reply, Safety Council maintains that pay rates at other entities are irrelevant to whether the pay differential between Fontenot and McCorquodale was based on factors other than gender because the reasonableness of their respective compensation is not at issue.[62] Safety Council claims that Fontenot is attempting to show the jury higher pay rates paid by other entities, but has not cited any authority that would allow her to introduce such irrelevant evidence.[63] Safety Council denies there is any relevance to such evidence, but in the alternative, urges the Court to limit Lowery's testimony such that he could testify that he double-checked his calculations against other entities' pay rates without disclosing the other entities or the specific pay rates themselves.[64] Safety Council argues that exposing the jury to pay rates at other entities creates a significant risk that the jury will improperly compare Fontenot's pay to those rates.[65]

Safety Council further argues that Lowery offered a legal opinion as to what the IRS "recommends" in the Treasury Regulation, which is incorrect and improper to submit to the jury.[66]

---

[60] *Id.* at 9.

[61] *Id.*

[62] Rec. Doc. 94 at 1–2.

[63] *Id.* at 2.

[64] *Id.*

[65] *Id.*

[66] *Id.*

Safety Council asserts that the Court is the sole source of the law[67] and that expert testimony involving inapplicable regulations should be excluded as irrelevant.[68] Safety Council argues that Fontenot's references to other IRS sources are irrelevant and that Fontenot has not cited any authority to support her arguments as to the relevance of those sources or the Treasury Regulation at issue.[69]

### 2. Lowery's Pay Scenarios

Safety Council contends that Fontenot's reliance on 29 C.F.R. § 1620.10 for the meaning of "wages" applies to payments made "as remuneration for employment," and so should not apply to the funds that McCorquodale misappropriated.[70] Safety Council claims that both Lowery and McCorquodale "confirmed" that they had no reason to dispute the findings of the audit investigation that "revealed [McCorquodale's] self-dealing."[71] Safety Council further contends that McCorquodale's Employment Contract was in effect throughout his tenure as CEO because the contract had a provision that renewed the contract unless either party opted to terminate it, and neither party did so.[72]

Further, Safety Council contests Fontenot's assertion that Safety Council's records should be presumed to be accurate.[73] Safety Council asserts that McCorquodale "admitted, without

---

[67] *Id.* at 3 (citing *In re Wyly*, 552 B.R. 338, 359 (Bkrtcy. N.D. Tex., 2016 (citing *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997))).

[68] *Id.* at 4 (citing *In the Matter of M&M Wireline & Offshore Servs., LLC*, No. 15-4999, 2017 WL 480603 (E.D. La. Feb. 3, 2017)).

[69] *Id.*

[70] *Id.* at 4–5.

[71] *Id.* at 5 (citing Lowery Deposition (Rec. Doc. 52-3) at 36; Deposition of Robert McCorquodale (Rec. Doc. 84-1) at 3) (hereinafter "McCorquodale Deposition").

[72] *Id.* (citing McCorquodale Employment Contract (Rec. Doc. 27-13) at 2).

[73] *Id.* at 6.

equivocation" that Safety Council did not approve the overpayments he made to himself.[74] Safety Council further asserts that Lowery has acknowledged that he did not have a basis for disputing John McDonald's 2011 investigation findings that McCorquodale did not have approval for payments that he issued to himself.[75] Thus, Safety Council argues that the "relevant[,] undisputed testimony" establishes that Safety Council's records reflect distorted and inaccurate information that should not be relied upon for Lowery's pay scenarios.[76]

Safety Council argues that there is no factual dispute as to whether McCorquodale's pay as reflected on his W-2s and Safety Council's Form 990s is inflated and inaccurate, and further alleges that Lowery has admitted to such.[77] Thus, Safety Council contends that Lowery's expert report and testimony regarding the pay scenarios should be excluded.[78]

### III. <u>Law & Analysis</u>

#### A. *Legal Standard for Relevant Evidence*

Federal Rule of Evidence 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Under Federal Rule of Evidence 402, relevant evidence is admissible unless the United States Constitution, a federal statute, the Federal Rules of Evidence or other rules prescribed by the Supreme Court provide otherwise, and irrelevant evidence is not admissible. Pursuant to Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence

---

[74] *Id.* (citing McCorquodale Deposition (Rec. Doc. 84-1) at 85).

[75] *Id.* (citing Lowery Deposition (Rec. Doc. 52-3) at 28–30, 32–33).

[76] *Id.*

[77] *Id.* at 8.

[78] *Id.* at 9.

12

if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The Fifth Circuit instructs that "[t]he exclusion of evidence under Rule 403 should occur only sparingly[.]"[79] "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403."[80]

## B. *Legal Standard for Expert Testimony*

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702, which governs the admissibility of expert witness testimony.[81] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.[82]

In *Daubert v. Merrell Down Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific testimony or evidence

---

[79] *United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993), *cert. denied*, 511 U.S. 1149 (1994).

[80] *Id.* at 1115–16 (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862 (1979)).

[81] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[82] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

admitted is not only relevant, but reliable."[83] The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[84] The court must also determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence – in other words, whether it is relevant.[85]

A court's role as a gatekeeper does not replace the traditional adversary system,[86] and "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[87] "[W]hile exercising its role as a gatekeeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits."[88] When facts are in dispute, the fact-finder is entitled to hear an expert's testimony and decide what weight, if any, to accord it, which includes a consideration of whether the facts on which the expert relied are accurate.[89] As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means

---

[83] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[84] *Kumho Tire*, 526 U.S. at 152.

[85] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[86] *See Daubert*, 509 U.S. at 596.

[87] Fed. R. Evid. 702 advisory committee's note to 2000 Amendments.

[88] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).

[89] *Id.; see also* Fed. R. Evid. 702 advisory committee's notes.

of attacking shaky but admissible evidence."[90] "Nevertheless, an expert may never render conclusions of law."[91] The law requires only one spokesman, the court.[92]

*C. Analysis*

### 1. Pay Rates at Other Entities

Safety Council argues that pay rates at other entities are not relevant to whether and why Safety Council paid Fontenot differently than McCorquodale in violation of the EPA.[93] Safety Council further argues that Lowery improperly provides legal opinions regarding a Treasury Regulation that is not relevant to the issues in this case.[94] In opposition, Fontenot claims that Lowery uses the pay rates at other entities as a way to ensure the reasonableness of his projections of McCorquodale's salary.[95] Fontenot asserts that Lowery references the Treasury Regulation to explain his rationale for comparing his projections to pay rates at other entities.[96]

The Court first considers whether Lowery's use of pay rates at other entities is relevant and reliable. An expert must base his testimony on reliable principles and methods and must apply those principles and methods to the facts of the case.[97] One test of reliability is whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.[98]

---

[90] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[91] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009)

[92] *Askanas*, 130 F.3d at 673.

[93] Rec. Doc. 52-1 at 11.

[94] *Id.* at 15; Rec. Doc. 94 at 2.

[95] Rec. Doc. 77 at 1–2.

[96] *Id.* at 3.

[97] Fed. R. Evid. 702(c)-(d).

[98] *See* Fed. R. Evid. 702 advisory committee's notes (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Lowery was asked to calculate "pay scenarios" under certain assumptions (discussed in detail, *infra*) as to what McCorquodale might have made for the years 2011 through 2017 had he remained in the position of CEO.[99] Lowery did not rely on the salaries paid by other entities in making his projections of what McCorquodale might have made under each pay scenario, but rather used those salaries to confirm that his outcomes were reasonable for the industry.[100] Because Lowery's reliance on the pay rates of other entities constitutes support for the reliability of his outcomes as to his projections of McCorquodale's salary, the Court finds that such evidence is relevant and will assist the trier of fact to understand the evidence as to McCorquodale's projected pay rate and to determine the amount of damages.[101] The Court further finds that the risk of confusing the jury with regard to their consideration of entities' pay rates can be overcome by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [as they] are the traditional and appropriate means of attacking shaky but admissible evidence."[102]

Lowery also relies on Treasury Regulation § 53.4958-6(a) to support his rationale for comparing pay rates at other entities to his projections of McCorquodale's salary.[103] This regulation is titled "Rebuttable presumption that a transaction is not an excess benefit transaction."[104] Safety Council asserts that this regulation is not applicable to an EPA claim and

---

[99] Lowery Report (Rec. Doc. 52-2) at 1.

[100] *Id.* at 2.

[101] *See* Fed. R. Evid. 702(a).

[102] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[103] Lowery Report (Rec. Doc. 52-2) at 2.

[104] 26 C.F.R. § 53.4958-6.

cites *In the Matter of M&M Wireline and Offshore Services, LLC* for the Court's authority to exclude expert testimony regarding inapplicable regulations.[105] In that case, this Court excluded expert testimony regarding an OSHA regulation, which the plaintiff argued provided guidance for the standard of care to be applied in the case.[106] By contrast, here, Fontenot does not argue that the regulation be applied to determine if Safety Council's payments were reasonable.[107] Rather, Lowery relies on the regulation as support for the appropriateness of his methodology for determining the reliability of his projections,[108] which is relevant.

To the extent that Lowery offers a legal conclusion as to the meaning and applicability of the Treasury Regulation, the Court agrees that it is inappropriate. The interpretation of the meaning of the Treasury Regulation is not a fact for the jury to decide, and, thus, cannot assist the jury. Moreover, an expert witness may not render legal conclusions.[109] Thus, to the extent that Lowery offers an opinion as to his interpretation of the Treasury Regulation or its general applicability set apart from the facts of the case, his testimony and relevant portion of his expert report will be excluded.

### 2. Lowery's Pay Scenarios

Safety Council argues that Lowery's pay scenarios are based on false assumptions of what McCorquodale was authorized to be paid, and, therefore, are not proper expert testimony.[110] In

---

[105] Rec. Doc. 52-1 at 15 (citing 2017 WL 480603).

[106] *In the Matter of M&M Wireline*, 2017 WL 480603 at *7–8.

[107] *See* Lowery Report (Rec. Doc. 52-2) at 2.

[108] *See id.*; *see also* Lowery Deposition (Rec. Doc. 52-3) at 45–46 ("[T]he Treasury Regulation is not the IRS' statement regarding in general but the – the methodology used is what they say is reasonable.").

[109] *Goodman*, 571 F.3d at 399.

[110] Rec. Doc. 52-1 at 23.

particular, Safety Council claims that Lowery relied on the false assumptions that McCorquodale's 2010 pay as reflected on his W-2 was approved and that he would have received a 6% annual increase.[111] Fontenot argues that Lowery relied on Safety Council's records, including McCorquodale's W-2s and Safety Council's Form 990s, to calculate pay scenarios that would assist the jury in determining the appropriate back pay amounts to be awarded to Fontenot, if necessary.[112] The Court finds that Lowery's projections are relevant to Fontenot's potential damages. In the event that damages are considered, the jury will be required to determine the appropriate amount of back pay to which Fontenot is entitled, and evidence as to what amount and under what compensation arrangement Safety Council paid McCorquodale is relevant to such a determination.

The Court further finds that Lowery's projections are based on sufficient facts.[113] Under each scenario, Lowery describes his bases for each projection, including the terms of McCorquodale's contract, the financial status of Safety Council between the years 2011 to 2017, and McCorquodale's W-2s and Safety Council's Form 990s.[114] The Court notes that the parties vigorously dispute whether, and by how much, McCorquodale's W-2s reflect unapproved payments, and is mindful not to "transform [this] *Daubert* [motion] into a trial on the merits."[115] When facts are in dispute, the factfinder is entitled to hear an expert's testimony and decide what weight, if any, to accord it, which includes a consideration of whether the facts on which the expert

---

[111] *Id.* at 16, 20.

[112] Rec. Doc. 77 at 7–8.

[113] *See* Fed. R. Evid. 702(b).

[114] *See generally*, Lowery Report (Rec. Doc. 52-2).

[115] *See Pipitone*, 288 F.3d at 250.

relied are accurate.[116] Because Lowery's pay scenarios are based on evidence in the record, the Court will not exclude Lowery's expert report and testimony related to the pay scenarios he calculated.

### IV. Conclusion

The Court finds that Lowery's expert report and testimony pertaining to pay rates at other entities and reliance on Treasury Regulation § 53.4958-6(a) are admissible evidence as to the reliability of the outcomes of his calculations. The Court, however, finds that Lowery's expert testimony as to the interpretation or applicability of the Treasury Regulation are not admissible because they render conclusions of law. The Court further finds that Lowery's expert report and testimony relating to projections of what McCorquodale might have made is relevant to the determination of damages and is based on sufficient facts. Accordingly,

**IT IS HEREBY ORDERED** that Safety Council's "Motion to Exclude the Opinions and Testimony of Israel Lowery"[117] is **GRANTED IN PART** to the extent that Lowery may not offer testimony that renders conclusions of law and is **DENIED** as to all other issues.

New Orleans, Louisiana, this 16th day of August, 2017.

NANNETTE JOLIVETTE BROWN
UNITED STATES DISTRICT JUDGE

---

[116] *Id.; see also* Fed. R. Evid. 702 advisory committee's notes.

[117] Rec. Doc. 52.