# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **JONI FONTENOT** | * | **CIVIL ACTION NO. 2:16-CV-84** |
| | * | |
| **VERSUS** | * | |
| | * | **CHIEF JUDGE BROWN** |
| **SAFETY COUNCIL OF SOUTHWEST** | * | |
| **LOUISIANA** | * | |
| | * | **MAGISTRATE JUDGE KAY** |
| | * | |
| | * | |

**************************************************************************

## ORDER AND REASONS

Before the Court is Plaintiff Joni Fontenot's ("Fontenot") "Renewed Rule 50(b) Motion for Judgment as a Matter of Law."[1] Having considered the pending motion, the memoranda in support and in opposition, the record, and the applicable law, the Court will deny the motion.

## I. Background

Fontenot entered into an employment contract with Safety Council of Southwest Louisiana ("Safety Council") on October 19, 2011, to be Chief Operating Officer ("COO") of Safety Council.[2] The employment contract was for a period of three years with an automatic renewal unless either party terminated the contract pursuant to the provisions therein.[3] In 2014, the contract renewed by its own terms, as neither party initiated its termination.[4] Fontenot's base salary from 2011 through 2015 was $95,000[5] with the opportunity to receive an annual bonus based on

---

[1] Rec. Doc. 186.

[2] Pretrial Ord. (Rec. Doc. 161) at 2.

[3] *Id.* at 2–3.

[4] *Id.* at 3.

[5] *See* "Raises and Promotions History" (Rec. Doc. 173-1) at 22 (Defendant's Trial Exh. 10, admitted Oct. 24, 2017); Testimony of Joni Fontenot (Rec. Doc. 177) at 27 (hereinafter "Fontenot Testimony").

1

"strategic efforts, membership and financial results."[6] Fontenot's salary was to "be set annually by the Safety Council Board of Directors" and her annual performance bonus was "as approved by the executive board."[7]

Prior to Fontenot's employment as COO, Robert J. McCorquodale ("McCorquodale") served as Chief Executive Officer ("CEO") of Safety Council from at least 2005 to 2011.[8] McCorquodale's 2005 contract set his base salary at $89,426.53 with a minimum of a three percent raise to a maximum of a six percent raise every year "upon approval by the President of the Executive Board," with the first three percent raise starting on January 1, 2005.[9] McCorquodale's contract also included a provision for the possibility of an annual bonus of up to $10,000 based on the performance of Safety Council and the accomplishments of McCorquodale and "upon approval by the President of the Executive Board."[10] McCorquodale's and Safety Council's tax records show years during which McCorquodale's reported wages were higher than what his contract provided as his base salary,[11] including 2010 when McCorquodale's W-2 from Safety Council reflected $149,831.37 in "wages, tips, other compensation."[12]

---

[6] Employment Contract of Joni Fontenot, dated Oct. 19, 2011 (Rec. Doc. 172-1) at 23 (Plaintiff's Trial Exh. 6, admitted Oct. 24, 2017) (hereinafter "Fontenot Employment Contract").

[7] Id. at 22–23.

[8] Pretrial Ord. (Rec. Doc. 161) at 2.

[9] Employment Contract of Robert J. McCorquodale, dated May 19, 2005 (Rec. Doc. 172-1) at 20 (Plaintiff's Trial Exh. 5, admitted Oct. 23, 2017) (hereinafter "McCorquodale Employment Contract").

[10] Id.

[11] See "Robert McCorquodale's Wages" (Rec. Doc. 172-2) at 1–25 (Plaintiff's Trial Exh. 16, admitted Oct. 24, 2016); "What Would Be Bob's Current Salary Had the Contract Been Adhered To" (Rec. Doc. 172-1) at 29 (Plaintiff's Trial Exh. 8, admitted Oct. 24, 2017) (also admitted as Defendant's Trial Exh. 6 (Rec. Doc. 173-1 at 18)) (hereinafter "McCorquodale Contract Salary Projections").

[12] "Robert McCorquodale's Wages" (Rec. Doc. 172-2) at 17.

McCorquodale stopped acting as CEO on June 15, 2011, creating a vacancy in the chief officer position at Safety Council.[13] After considering at least four applicants, Safety Council offered Fontenot the position, styled as COO.[14] Fontenot accepted Safety Council's first offer of an annual salary of $95,000.[15] Fontenot's tenure as COO began on October 19, 2011.[16]

Nearly four years later, on September 3, 2015, Fontenot notified President of the Executive Board, Steven Trahan ("Trahan"), of her dissatisfaction with her salary.[17] Trahan asked Fontenot to make a proposal.[18] On November 10, 2015, Fontenot's lawyer sent Safety Council: (1) a proposal for a new contract proposing, *inter alia*, an annual salary of $149,000[19] and (2) a demand letter raising allegations that Safety Council was in violation of the Equal Pay Act ("EPA").[20]

On January 19, 2016, Fontenot filed suit against Safety Council in the United States District Court for the Western District of Louisiana, alleging that she was being paid less than her male predecessor for performing equal work under similar working conditions in violation of the EPA.[21] Fontenot also claimed that Safety Council unlawfully retaliated against her for making a

---

[13] Pretrial Ord. (Rec. Doc. 161) at 2.

[14] Minutes of E-Board Meeting 8/3/11 (Rec. Doc. 173-1) at 17 (Defendant's Trial Exh. 5, admitted Oct. 23, 2017).

[15] *See* Fontenot Testimony (Rec. Doc. 177) at 51–55; "Raises and Promotions History" (Rec. Doc. 173-1) at 22.

[16] Pretrial Ord. (Rec. Doc. 161) at 2.

[17] Fontenot Testimony (Rec. Doc. 177) at 34.

[18] *Id.*

[19] Letter from Plaintiff's Counsel to Safety Council and Fontenot's Contract Proposal, dated Nov. 10, 2015 (Rec. Doc. 173-1) at 29–32 (Defendant's Trial Exh. 12, admitted Oct. 24, 2017).

[20] Demand Letter from Plaintiff's Counsel to Safety Council, dated Nov. 10, 2015 (Rec. Doc. 173-1) at 70 (Defendant's Trial Exh. 34, admitted Oct. 25, 2017).

[21] Compl. (Rec. Doc. 1).

complaint.[22] The next day, Fontenot received an email from Trahan stating that she would receive a bonus of $6,000 for the year 2015 and a pay increase of six percent.[23] On July 12, 2017, referencing the termination clause in the contract, Safety Council gave notice to Fontenot that it would allow the contract to expire by its own terms, stating it had concerns about some of the terms in the contract and offering to meet with Fontenot "to consider whether a new mutually satisfactory contract [could] be reached."[24]

## B. Procedural Background

On January 19, 2016, Fontenot filed suit against Safety Council alleging violations of the EPA, 29 U.S.C. § 206(d)(1), and the anti-retaliation provision of the Fair Labor Standards Act ("FLSA"),[25] § 215(a)(3).[26] Prior to trial, the Court ruled that Fontenot had proven a *prima facie* case that she was paid differently than McCorquodale for performing equal work that requires equal skill, effort, and responsibility under similar working conditions.[27] The parties stipulated that Safety Council was an employer covered by the Equal Pay Act.[28] Therefore, the issues that remained for trial were: (1) whether the difference between Fontenot's and McCorquodale's pay was based on a factor other than sex; (2) Fontenot's retaliation claim; and (3) damages.[29] A jury

---

[22] *Id.* at 3.

[23] Email from Steven Trahan to Joni Fontenot dated Jan. 20, 2016, (Rec. Doc. 173-1) at 33 (Defendant's Trial Exh. 13, admitted Oct. 24, 2017).

[24] Letter from Steve Trahan to Joni Fontenot dated July 12, 2017 (Rec. Doc. 172-3) at 58 (Plaintiff's Trial Exh. 29, admitted Oct. 24, 2017).

[25] In 1963, the Equal Pay Act was enacted and incorporated into § 206, "Minimum Wage," of the Fair Labor Standards Act. 77 Stat. 57 (1963).

[26] Compl. (Rec. Doc. 1).

[27] *See* Rec. Doc. 49.

[28] *See* Tr. (October 23, 2017, Bench Conference).

[29] *See* Jury Verdict Form (Rec. Doc. 171).

trial was held October 23–26, 2017. The jury found that Safety Council had not violated the EPA by paying Fontenot less than her male predecessor, but that Safety Council had retaliated against Fontenot because she engaged in EPA-protected activity.[30] The jury awarded Fontenot $120,000 in damages for Safety Council's retaliation.[31] On November 14, 2017, Fontenot filed the instant renewed motion for judgment as a matter of law challenging the sufficiency of the evidence for the jury's finding that Safety Council had not violated the EPA.[32] Safety Council opposes the motion.[33]

## II. Parties' Arguments

### A. Fontenot's Arguments in Support of the Motion

In support of the motion, Fontenot first argues that the jury instructions and verdict form did not track the language of the statute, which requires Safety Council to prove that it considered the pay differential between Fontenot's and McCorquodale's salaries at the time it set Fontenot's salary.[34] Therefore, Fontenot argues, evidence that was not considered by the committee that set Fontenot's pay (the "Committee") is irrelevant.[35] Second, Fontenot argues that evidence of the "merits" of Fontenot's predecessor as compared to Fontenot's "merits" are not properly considered as a "factor other than sex," an affirmative defense under the EPA.[36] Finally, Fontenot asserts that

---

[30] *Id.*

[31] *Id.*

[32] Rec. Doc. 186.

[33] Rec. Doc. 192.

[34] Rec. Doc. 188 at 8, 15.

[35] *Id.* at 15.

[36] *Id.* at 9.

there was no evidence that "negotiations" took place prior to entering into the contract, and, therefore, "negotiations" could not be considered a "factor other than sex."[37]

As to her first argument, Fontenot sets forth "general principles of law" regarding statutory interpretation, to support her assertion that the exact language of the statute should have been submitted to the jury.[38] Fontenot claims that the Court presented the statute to the jury as:

> except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) any factor other than sex.[39]

Fontenot argues that the language of the fourth defense, as she claims the Court presented it to the jury, does not have the same meaning as the language in the statute, "(iv) a differential based on any other factor other than sex."[40] Fontenot asserts that every word in a statute has a meaning and that the "catch all" exception cannot be read to render the other defenses superfluous.[41] Fontenot further asserts that the defenses to the EPA must be narrowly construed[42] and that Safety Council was required to prove a "bona fide use of 'other factors other than sex.'"[43] Finally, Fontenot contends that it was Safety Council's burden to prove that sex played no role in setting her pay and that subjective evaluations are insufficient, otherwise "the exception swallows the rule."[44]

---

[37] *Id.* at 23.

[38] *Id.* at 9–11.

[39] *Id.* at 8.

[40] *Id.*

[41] *Id.* at 9–11.

[42] *Id.* at 11 (citing *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1047 (5th Cir. 1973); *Hodgson v. Colonnades, Inc.*, 472 F.2d 42, 47 (5th Cir. 1973)).

[43] *Id.* (quoting *Washington Cty. v. Gunther*, 452 U.S. 161, 170 (1981)).

[44] *Id.* at 12–13.

Fontenot then argues that the evidence showed that the Committee did not differentiate between Fontenot and her predecessor, McCorquodale, when setting Fontenot's salary.[45] Instead, according to Fontenot, the Committee "used [Fontenot's] current rate of pay, [Fontenot's] experience and [the Chief Operating Officer] job description" to set Fontenot's salary.[46] Thus, Fontenot argues, the Committee's determination was based on "their own highly subjective perception of employee worth based on her past salary."[47]

Fontenot further argues that the statute requires Safety Council to prove that it derived the amount of money that equals the difference between Fontenot's salary and McCorquodale's salary from a factor other than sex.[48] According to Fontenot, Safety Council was required by law to keep a record of the factors it used to set Fontenot's salary.[49] Fontenot claims that the testimony of the members of the Committee proved that they did not consider "the difference" but instead considered Fontenot's previous salary, the responsibilities of the COO, and, through circumstantial evidence, the salary of another male employee in a different position.[50] Therefore, Fontenot argues, because Safety Council did not consider McCorquodale's salary when setting Fontenot's salary, Safety Council cannot justify the difference between their salaries.[51] Fontenot asserts that,

---

[45] *Id.* at 14–15.

[46] *Id.* at 14.

[47] *Id.*

[48] *Id.* at 15.

[49] *Id.* at 15–16 (citing 29 C.F.R. § 1620.32(b)).

[50] *Id.* at 16.

[51] *Id.* at 16–17.

consequentially, the testimony and evidence offered as to McCorquodale's experience, "juxtaposed against Fontenot's" experience, were irrelevant.[52]

Second, according to Fontenot, any evidence relating to McCorquodale's merits, are not sufficient to prove a defense under the "catch all" exception because the EPA specifically provides a separate defense for payments made pursuant to a merit system.[53] Moreover, Fontenot argues that Safety Council bore the burden of proving that education and experience "adds value to the job," and that Safety Council did not present evidence as to why McCorquodale's education and experience was worth a higher salary than Fontenot's, considering that the work of Safety Council was "more akin to running a college than working as a safety engineer."[54] Fontenot cites "jurisprudential support" for the propositions that: (1) subjective evaluations of an employee's merit are not sufficient to establish an affirmative defense to the EPA; (2) that evidence as to merit cannot be used to support a defense under the "catch all" provision; and (3) that an employer must prove that its asserted "factor other than sex" was the factor it used to determine the pay differential.[55] Fontenot claims Safety Council's Committee used subjective evaluations and argued Fontenot's and McCorquodale's relative merits at trial even though the Committee did not compare them when it set Fontenot's salary.[56]

Third, Fontenot asserts that Safety Council took the position that Fontenot's salary was the result of negotiations.[57] Fontenot challenges this position as an insufficient "factor other than sex"

---

[52] *Id.* at 17–18.

[53] *Id.* at 19.

[54] *Id.* at 20.

[55] *Id.* at 21, 23 (citing *Hodgson v. Brookhaven Gen. Hosp.*, 436 F.2d 719, 726 (5th Cir. 1970)).

[56] *Id.* at 22.

[57] *Id.* at 23–25.

because there were no meaningful negotiations.[58] Fontenot contends that merely accepting a job

without requesting more money does not constitute negotiations.[59] Fontenot also cautions that EPA

cases require a case-by-case analysis of the facts, and that the cases previously cited by Safety

Council in various briefs are distinguishable from the facts in this case.[60] For all these reasons,

Fontenot argues that Safety Council has failed to prove its affirmative defense under the EPA.[61]

Considering these arguments, Fontenot contends that she has proven damages as a result

of Safety Council's violation of the EPA in the amount of $384,800.[62] Fontenot asserts that this

amount is the difference between McCorquodale's wages and Fontenot's wages,[63] including what

McCorquodale would have been paid based on his wage increases.[64] Fontenot further asserts that

when an employer fails to maintain accurate records as required by statute, any uncertainty in the

difference between wages should be resolved against the discriminating employer.[65]

For all these reasons, Fontenot moves the Court to find that Safety Council failed to prove

an affirmative defense and grant Fontenot $384,800 in back pay, as well as all other appropriate

relief.[66]

---

[58] *Id.*

[59] *Id.* at 25.

[60] *Id.* at 25–29 (distinguishing *Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 269 (E.D.N.Y. 2015); *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993); *Meisner v. Texas*, 252 F.3d 435 (5th Cir. 2001); *Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832 (S.D. Tex. 2011); *Browning v. Sw. Research Inst.*, 288 F. App'x 170 (5th Cir. 2008)).

[61] *Id.* at 29.

[62] *Id.* at 31.

[63] *Id.* at 29 (citing 29 C.F.R. § 1620.10 (defining "wages")).

[64] *Id.* at 31.

[65] *Id.* at 30 (citing *Lowe v. Southmark Corp.*, 998 F.2d 335, 337 (5th Cir. 1993)).

[66] *Id.* at 32.

***B. Safety Council's Arguments in Opposition to the Motion***

In opposition to the motion, Safety Council first contends that the Court's jury instructions were legally correct.[67] Second, Safety Council claims that its position has consistently been that Fontenot had less education and experience than McCorquodale and that Safety Council wanted to correct payment excesses it discovered under McCorquodale.[68] Safety Council asserts there is sufficient evidence to support the jury's verdict that the difference in pay between Fontenot and McCorquodale was based on these factors other than sex.[69] Third, Safety Council rebuts Fontenot's arguments characterizing its defense as one of the three "system" defenses allowed by the EPA.[70]

Safety Council asserts that it was undisputed that Fontenot's education and experience in management and the safety field "paled in comparison" to that of McCorquodale.[71] According to Safety Council, it was also undisputed that its board members had known McCorquodale for at least the decade during which McCorquodale was employed by Safety Council, and that the board members had been familiar with his experience in management and the safety field.[72] Safety Council also asserts that it is undisputed that by the summer of 2011, Safety Council was aware of "both McCorquodale's proper and approved salary as well as the significant excess amounts he had improperly paid himself."[73] Safety Council further contends that the salary offered to, and accepted by, Fontenot was comparable to what McCorquodale had earned in his sixth year in the

---

[67] Rec. Doc. 192 at 3.

[68] *Id.* at 3–4.

[69] *Id.* at 2.

[70] *Id.* at 5–7.

[71] *Id.* at 3.

[72] *Id.* at 3–4.

[73] *Id.* at 4.

position.[74] Therefore, according to Safety Council, the jury had sufficient evidence to conclude that Fontenot's pay was premised on the differences between Fontenot's and McCorquodale's experience as well as the board's desire to "correct and remediate pay and benefit excesses manipulated by [McCorquodale] through the contract structure then in place."[75] Safety Council claims that the jury made credibility determinations when it came to the conclusion that Safety Council had proved that gender was not a factor in setting Fontenot's salary.[76]

Rebutting Fontenot's assertion that Safety Council attempted to prove a defense based on a "merit system," Safety Council reasserts that it has always claimed it paid Fontenot differently than McCorquodale because of the "catch-all" affirmative defense, § 206(d)(1)(iv), and not based on a "merit system," § 206(d)(1)(ii).[77] In so doing, Safety Council further asserts that Fontenot's salary determination was not based on the subjective whim of the Committee, and moreover, that it is undisputed that Fontenot's education and experience were "drastically below" that of McCorquodale.[78] As for Fontenot's criticisms of the cases cited by Safety Council, Safety Council argues that Fontenot focuses on whether the courts considered "system" defenses, which are not a requirement under the fourth "catch-all" defense of the EPA.[79] Safety Council contends that the "catch-all" defense of "a differential based on any other factor other than sex" is broad and includes

---

[74] *Id.*

[75] *Id.*

[76] *Id.* at 5.

[77] *Id.*

[78] *Id.*

[79] *Id.* at 6.

factors such as difference in experience, job level, skill levels, and previous training, as well as exigent circumstances of the business.[80]

In summation, Safety Council asserts that the jury was able to assess the witnesses' credibility to determine that Safety Council had proved that it based Fontenot's salary on factors other than sex, namely the differences in experience between Fontenot and McCorquodale and Safety Council's desire to correct pay and benefit excesses built into McCorquodale's contract.[81]

### III. Legal Standard

Federal Rule of Civil Procedure 50(a)(1) provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on the issue, the court may:
>
> > (A) resolve the issue against the party; and
> >
> > (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

If the court does not grant a motion for judgment as a matter of law pursuant to Rule 50(a)(1), within twenty-eight days after the entry of judgment a party may file a renewed motion for judgment as a matter of law and include an alternative request for a new trial under Rule 59.[82] "In ruling on the motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."[83]

---

[80] *Id.* at 6–7 (citing *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 803 (5th Cir. 1982); *Wojciechowski*, 763 F. Supp. 2d at 852).

[81] *Id.* at 7.

[82] Fed. R. Civ. P. 50(b).

[83] *Id.*

A motion pursuant to Rule 50(b) "in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict."[84] Therefore, under Rule 50(b), "judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue."[85] In evaluating a Rule 50(b) motion, a court must "consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party."[86] Because all reasonable inferences and credibility determinations should be resolved in favor of the non-movant, "judgment as a matter of law should not be granted unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion."[87]

The Equal Pay Act makes it unlawful for an employer covered by the Act to discriminate between employees on the basis of sex "by paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[88] A differential in pay between the sexes is not unlawful when the payments are made pursuant to: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other

---

[84] *Flowers v. S. Reg'l Physician. Servs., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (quoting *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000)) (internal quotations omitted).

[85] *Id.* (quoting *Ford*, 230 F.3d at 830) (internal quotations omitted).

[86] *Id.* (quoting *Brown v. Bryan Cty, Okla.*, 219 F.3d 450, 456 (5th Cir. 2000) (internal quotations omitted).

[87] *Id.* (quoting *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1322 (5th Cir. 1994) (internal quotations omitted).

[88] 29 U.S.C. § 206(d)(1).

factor other than sex."[89] The jury found that Safety Council had proved that the difference in pay between Fontenot and McCorquodale was based on a factor other than sex.[90]

## IV. Analysis

In challenging the jury's verdict, Fontenot claims there was not sufficient evidence for the jury to find that the difference in pay between Fontenot and McCorquodale was based on a factor other than sex because: (1) when setting Fontenot's salary, Safety Council did not differentiate it from McCorquodale's and, therefore, any evidence of factors other than sex that were not considered by Safety Council at that time is irrelevant;[91] (2) evidence of respective merits are not properly considered as a "factor other than sex;"[92] and (3) no evidence was presented of meaningful negotiations before Fontenot entered into an employment contract with Safety Council for the position of COO.[93] [94] In response, Safety Council contends that sufficient evidence was introduced for the jury to find that the difference in pay was based on Fontenot having less experience than McCorquodale as well as Safety Council's desire to correct the payment and benefit excesses during McCorquodale's tenure by changing the contract structure, both of which

---

[89] *Id.*

[90] Jury Verdict Form (Rec. Doc. 171).

[91] Rec. Doc. 188 at 14–19.

[92] *Id.* at 19–23.

[93] *Id.* at 23–25.

[94] Fontenot also challenges the Court's instruction to the jury on Safety Council's EPA defense. Fontenot alleges that the Court instructed the jury that the EPA's fourth affirmative defense allows payments made pursuant to "any factor other than sex," as opposed to the statutory language allowing payments made pursuant to "a differential based on any other factor other than sex." Rec. Doc. 188 at 1. Fontenot made her objection to this instruction at the charge conference, and the Court overruled it. Further, Fontenot's assertion, as stated in the instant motion, is not accurate. *See* Jury Instructions (Rec. Doc. 169) at 14; Verdict Form (Rec. Doc. 171) at 1 (instructing the jury that Safety Council must prove that the *difference in pay* between Fontenot and McCorquodale was *based on a factor other than sex* (emphasis added)). Accordingly, the Court will not address Fontenot's reurging of this legal argument in her Renewed Motion for Judgment as a Matter of Law, which is a vehicle for challenging the legal sufficiency of the evidence presented at trial. *Flowers*, 247 F.3d at 235 (quoting *Ford*, 230 F.3d at 830 (internal quotations omitted)).

are factors other than sex.[95] The Court notes that neither party cited any portion of the record in support of their respective positions.

Because the evidence offered in relation to Safety Council's desire to change the chief officer's contract structure elucidates the amount of difference in pay between Fontenot and McCorquodale, the Court begins its consideration with Safety Council's second factor other than sex. At trial, the parties submitted evidence that showed differences between McCorquodale's salary pursuant to his contract and what his tax records reflected as his income. In 2005, McCorquodale entered into a contract with Safety Council that provided an annual base salary of $89,426.53 with a three percent increase starting January 1, 2005.[96] His contract also provided for a three to six percent increase in salary every year and an annual bonus of up to $10,000, each of which was to be approved by the President of the Executive Board.[97] Both parties introduced the same exhibit projecting what McCorquodale's salary would have been each year pursuant to the terms of the contract under the maximum annual raise allowed:

---

[95] Rec. Doc. 192 at 4.

[96] McCorquodale Employment Contract (Rec. Doc. 172-1) at 20.

[97] *Id.*

**SAFETY COUNCIL OF SOUTHWEST LOUISIANA**
**What would be Bob's current salary**
**had the contract been adhered to**

| Begin | End | Annual Base Salary Per Contract | Max Raise |
|---|---|---|---|
| 01/01/05 | 12/15/05 | 92,109.33 | |
| 01/01/06 | 12/31/06 | 94,872.61 | 3% |
| 01/01/07 | 01/31/07 | 100,564.97 | 6% |
| 01/01/08 | 10/15/08 | 106,598.87 | 6% |
| 01/01/09 | 07/15/09 | 112,994.80 | 6% |
| 01/01/10 | 12/31/10 | 119,774.49 | 6% |
| 01/01/11 | 06/15/11 | 126,960.96 | 6% |

[98]

Evidence and testimony were offered that, in June 2011, Safety Council sought information, which was provided by Safety Council's Certified Public Accountant ("CPA"), John McDonald ("McDonald"), regarding payments made to McCorquodale and what was allowed under McCorquodale's contract.[99] Safety Council also submitted evidence that compared McCorquodale's actual base salary with his contract's stated maximum base salary, showing alleged annual overpayments ranging between roughly $3,400 and $12,600 for the years 2007

---

[98] McCorquodale Contract Salary Projections (Rec. Doc. 172-1) at 29; Rec. Doc. 173-1 at 18.

[99] *See e.g.*, Emails between John McDonald and Joe Andrepont re: Preparation for Executive Board Meeting (Rec. Doc. 173-1) at 14 (Defendant's Trial Exh. 3, admitted Oct. 23, 2017); Tr. (Oct. 24, 2017, Testimony of Joe Andrepont) (hereinafter "Andrepont Testimony") ("And so from that point I asked Mr. McDonald, 'I want you to continue to dig and find what's going on.'"); Tr. (Oct. 23, 2017, Testimony of Larry DeRoussel) (hereinafter "DeRoussel Testimony"):

> Q: … [W]hat information were you asking Joe Andrepont for at that time?
>
> A: … [W]hat Mr. McCorquodale's salary at that point in time would have been had the contract been adhered to.
>
> Q: And were you provided this information by Mr. McDonald?
>
> A: Yes. Mr. McDonald put the spreadsheets together with that information.

through 2011.[100] Fontenot submitted evidence of McCorquodale's tax records showing, for example, that McCorquodale's "wages, tips, [and] other compensation" from Safety Council was $149,880.02 in 2009 and $149,831.37 in 2010.[101] Evidence and testimony was offered that Fontenot's base salary was $95,000 from when she started as COO in 2011 through when she filed the instant lawsuit in 2016.[102]

In support of its affirmative defense, Safety Council introduced evidence and offered testimony of its concerns and decisions in 2011 regarding what it considered excess payments that McCorquodale had paid himself and how to guard against that in the future. The minutes of the July 1, 2011 executive board meeting state:

> A presentation was also made by Mike McDonald, CPA and a review of salary taken by [McCorquodale], as well as life insurance premiums made on behalf of [McCorquodale], was presented.
>
> …Discussions were had concerning the amount that [McCorquodale] may owe back to the Safety Council[.] . . . Factors in discussions included the amounts or potential amounts at issue[,] . . . the need to maintain the good reputation and standing of the Council, the need to correct potential weakness in financial checks and balances of the Council to ensure financial stability and insure against mismanagement in the future[.] . . .
>
> It was concluded that rather than the Council owing [McCorquodale] for any compensation of vacation pay, salary compensation and life insurance premiums, [McCorquodale] more than likely owed reimbursement to the Council in excess of $100,000.00, not including, possible personal cash advances and other personal items obtained by Bob through the use of the Safety Council credit card.[103]

---

[100] "Bob McCorquodale Base Salary Paid Compared to Max per Contract" (Rec. Doc. 173-1) at 96 (Defendant's Trial Exh. 42, admitted Oct. 25, 2017).

[101] "Robert McCorquodale's Wages" (Rec. Doc. 172-2) at 7, 17.

[102] *See* "Raises and Promotions History" (Rec. Doc. 173-1) at 22; Fontenot Testimony (Rec. Doc. 177) at 27.

[103] Minutes of E-Board Meeting 7/1/11 (Rec. Doc. 173-1) at 1 (Defendant's Trial Exh. 1, admitted Oct. 23, 2017). The minutes state that board members Joe Andrepont and Steve Morris were in attendance, both of whom were among the board members that set Fontenot's pay, as discussed *infra*.

Minutes from another Safety Council board meeting, a week later, showed consideration of the same topics:

> Presentation made by Sean McDonald CPA w/McDonald Associates relating to Safety Council credit card, including cash advances and other possible non Council related charges, vacation pay and unused vacation pay issue and life insurance premium payments and bonuses, all of which payments were compared to payment allowable under [McCorquodale's] 2005 contract.
>
> Background information and a summary of previous E-Board meetings regarding [McCorquodale's] resignation was provided by Joe Andrepont. A draft of a letter voted on by the E-Board to be sent to [McCorquodale] was read and after discussion a motion was made to attempt to arrive at a specific amount believed to be owed by [McCorquodale] as reimbursement to the Safety Council and this amount was to be included in a demand for 10% of the amount believed to be owed – the motion carried. Further discussion involved maintaining the integrity of the Safety Council and corrective action planned in the coming weeks and months to ensure sufficiency checks and balances for the safekeeping of Council funds and the plans of the Steering committee to locate and hire a new Director.[104]

Board members who were on the Committee that hired Fontenot as COO and set her salary testified that they believed McCorquodale had paid himself amounts in excess of his contract that were not approved by Safety Council.[105] One board member on the Committee testified that after learning of the financial issues during McCorquodale's tenure:

---

[104] Safety Council Board Meeting 7/7/11 (Rec. Doc. 173-1) at 16 (Defendant's Trial Exh. 4, admitted Oct. 23, 2017). The minutes reflect that Joe Andrepont, Larry DeRoussel, and Steve Morris were present at this meeting, all of whom were among the board members that set Fontenot's pay, as discussed *infra*.

[105] *See* Tr. (Oct. 24, 2017, Andrepont Testimony) ("Q: . . . [W]hat was your take-away from . . . this page about base salaries and the raises that Mr. McCorquodale paid himself? A: They were excessive and they weren't approved."); Tr. (Oct. 23, 2017, DeRoussel Testimony) ("Q: Do you recall if Mr. Phelps ever commented at the meeting or suggested any of the payments at issue had been approved? A: Mr. Phelps indicated – said that he had not approved any of those payments, salary, bonus, vacation, et cetera."); Tr. (Oct. 25, 2017, Testimony of Steven Morris (hereinafter "Morris Testimony")):

> Q: . . . [D]o you recall anyone ever complaining of, oh, no, some of these are approved or this or that's approved?
> A: No, nobody ever said anything like that.

> [m]y primary concern at that time as part of the committee was to –
> we had to get things under control. We had to get rid of a lot of the
> built-in things that were ongoing and get the salaries back to where
> I felt they were reasonable. . . . Primary [things I wanted changed
> from the contract] were the automatic set bonuses, the automatic set
> pay increases. There were several others, I think.[106]

Fontenot does not specifically challenge this "factor other than sex" offered by Safety Council. Considering the foregoing, the Court finds that evidence was introduced at trial to support a finding that Safety Council paid Fontenot less than McCorquodale because it wanted to correct and guard against excessive payments that it believed occurred under the structure in place during McCorquodale's tenure–a factor other than sex. Accordingly, the evidence is sufficient for a reasonable jury to find that the difference in pay between Fontenot and McCorquodale was based on a factor other than sex.

To the extent any difference between Fontenot's and McCorquodale's pay is not attributable to the previous factor involving correcting the contract structure, the Court considers the evidence relating to Safety Council's "factor other than sex" defense. Safety Council also claims that it paid Fontenot less than McCorquodale because she had less education and experience in management and the safety field.[107] The Fifth Circuit has stated that "'[d]ifferent job levels, different skill levels, previous training and experience[,] all may account for unequal salaries in an environment free from discrimination.'"[108]

---

. . .

Q: And do you recall any of the attendees of this meeting speaking out to express that, oh, no, certain things were authorized or were approved?

A: Oh, no, sir.

[106] Tr. (Oct. 25, 2017, Morris Testimony).

[107] Rec. Doc. 192 at 3.

[108] *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1138 (5th Cir. 1983) (quoting *Pouncy*, 668 F.2d at 803).

At trial, Safety Council board members who were on the Committee that set Fontenot's salary testified as to how they determined the salary to offer Fontenot. Committee member Larry DeRoussel ("DeRoussel") testified that the then-President of Safety Council, Joe Andrepont ("Andrepont"), determined a figure, consulted Safety Council's CPA, and then suggested the figure to the other Committee members.[109] The Committee members testified that they considered some combination of Fontenot's experience and background, her prior salary, and the increased responsibilities of COO.[110] Andrepont, then-President of Safety Council and Committee member, testified as to the benefits of having someone with experience as the chief officer of Safety

---

[109] Tr. (Oct. 23, 2017, DeRoussel Testimony) ("The way we approached the salary amount is that Joe Andrepont, who was president at the time, came up with a number, a figure. He ran it by John McDonald to get his opinion relative to the fairness, made us, me aware of it.").

[110] Tr. (Oct. 23, 2017, DeRoussel Testimony) ("And I was in agreement based on her experience, her background, et cetera, that that was a fair offer and an appropriate increase in salary for the responsibilities that she was going to take on."); Tr. (Oct. 24, 2017, Andrepont Testimony) ("We looked at her [existing pay] and we looked at her experience, or lack of."); Tr. (Oct. 25, 2017, Morris Testimony):

> Q: Because when you decided to pay Joni all you considered was her salary and the position she was in and y'all raised it some above that, correct?
>
> A: We looked at – her salary was determined by, also, her previous managerial experience and background in industry, those things, in addition to what her previous salary was, yes.

Council,[111] and noted specifically that Safety Council knew that Fontenot did not have the experience that McCorquodale did.[112]

---

[111] Tr. (Oct. 24, 2017, Andrepont Testimony):

Q: With respect to the credentials that you described for Mr. McCorquodale, how does that education and experience benefit the Safety Council?

A: Well, number of things. When you have the knowledge of what's required – keep in mind, a large portion of the Safety Council business are contractors that are coming in to do work at the different facilities. Understanding what those requirements and needs are, what you want from your contractor worker based in your facilities is huge.

. . .

Q: Did you have any concerns about the limitations of Ms. Fontenot's experience in selecting her?

A: I shared with her that we would have somewhat of an oversight committee, that we would meet quarterly or what not to go over things with her. I said, "Listen, you don't have the – you know, that safety background. However, what we do have on the board are a number of people from industry . . . ." So, I mean, there were some good resources . . . that she could utilize.

[112] Tr. (Oct. 24, 2017, Andrepont Testimony):

Q: . . . What did you consider with respect to Ms. Fontenot insofar as – or did you consider her experience? Let me ask it that way.

A: Absolutely. We looked at that. We looked at her existing position. Given the background of what had just occurred under Mr. McCorquodale, we felt that it would be a smoother transition with Joni. We knew she didn't have the experience, near the experience what [McCorquodale] had . . . .

. . .

A: . . . [McCorquodale] understood the Safety Council business. His background when he was the HS&E, the health, safety and environmental manager for PPG for a number of years, and having that background, you don't get that job by not having the credentials and understanding. . . . And when you're dealing with safety regulations and environmental regulations you really have to be on your game. So given that, the man was very knowledgeable of those things.

We recognized Joni didn't have those credentials but at the same time felt like that it would be a good transition to employ her and offer her the job. . . .

The Committee members testified that they did not compare McCorquodale's salary to what they intended to offer Fontenot.[113] However, they did testify that they were familiar with the difference in experience between McCorquodale and Fontenot.[114] They also testified that, at the time they hired Fontenot and set her salary, they were aware of what McCorquodale's pay should have been in light of the recent investigation and meetings concerning the overpayment issues.[115]

Fontenot impeached some of the Committee members with their prior deposition testimony where they did not state that the recent history regarding McCorquodale's salary and the financial irregularities were on their minds at the time they set Fontenot's pay.[116] However, the Court must

---

[113] Tr. (Oct. 23, 2017 DeRoussel Testimony) ("Now, to say that I consciously evaluated what her offer was going to be against what he was making, I didn't do that."); Tr. (Oct. 24, 2017, Andrepont Testimony) ("I don't think [McCorquodale's actual pay] was considered."); Tr. (Oct. 25, 2017, Morris Testimony) ("I was aware of what Mr. McCorquodale's salary was but I don't recall that I personally did a comparison of his salary to her salary, whether it was before or after.").

[114] Tr. (Oct. 23, 2017, DeRoussel Testimony) ("Mr. McCorquodale's background in management and safety was significantly greater than Ms. Fontenot's."); Tr. (Oct. 24, 2017, Andrepont Testimony) ("We knew she didn't have the experience, near the experience what [McCorquodale] had.").

[115] Tr. (Oct. 25, 2017, Morris Testimony) ("I was aware of what [McCorquodale's] salary should have been and where it was."); Tr. (Oct. 24, 2017, Andrepont Testimony) ("We looked at [her experience]. We looked at her existing position. Given the background of what had just occurred under Mr. McCorquodale, we felt that it would be a smoother transition with Joni. We knew she didn't have the experience, near the experience what [McCorquodale] had."); Tr. (Oct. 23, 2017 DeRoussel Testimony)

> We had been through numerous meetings and discussions prior to arriving at Ms. Fontenot's salary and choosing her. So, consequently, having gone through those numbers on Mr. McCorquodale's situation, you know, the fact that this is what his salary should have been, this is what he was paying himself, et cetera, et cetera, was certainly on my mind.

[116] *See e.g.*, Tr. (Oct. 25, 2017, Morris Testimony):

> A: I was aware of what [McCorquodale's] salary should have been and where it was.
>
> . . .
>
> Q: Okay. Now, do you recall at your deposition you were asked the exact same question, "Did you compare it," referring to [Fontenot's] pay, "with projections what Bob McCorquodale's salary should have been?" Did I read that correctly?
>
> A: Yes, sir.

"consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party."[117] Therefore, to the extent the Committee members' deposition testimony differed from their trial testimony, the Court finds that a reasonable jury could have believed the Committee members' testimony at trial rather than during their depositions.

---

. . .

Q: And what was that answer?

A: "No, sir."

Q: Is that accurate? Was your memory accurate [on the date of the deposition]?

A: No. It's accurate today but not at that time.

Q: So you were wrong?

A: I was wrong.

. . .

A: I forgot. I didn't recall that. That's correct.

Tr. (Oct. 23, 2017, DeRoussel Testimony):

Q: [U]pon receiving your deposition, you advised to delete 'We looked at what McCorquodale should have been making at that time.' You agree you said delete that, that was wrong?

. . .

A: Yes. . . .

. . .

Q: You didn't tell us during this deposition, one chance, second chance, you didn't tell us any other information such as, well, generally we'd been looking at this and so it was in the back of my mind somewhere? You didn't say that in your deposition, did you?

A: I didn't go into that detail in the deposition.

Q: And you didn't say it on your errata sheet?

A: I did not go into that detail in the errata sheet.

[117] *Flowers*, 247 F.3d at 235 (quoting *Brown*, 219 F.3d at 456) (internal quotations omitted).

Still, Fontenot essentially asserts that in order to have proved the defense, "a differential based on any factor other than sex," Safety Council was required to prove that it specifically and purposely considered McCorquodale's salary and the differences between McCorquodale and Fontenot when setting Fontenot's pay.[118] Fontenot cites 29 C.F.R. § 1620.32(b) to support this proposition.[119] However, this regulation, titled "Recordkeeping requirements," merely requires an employer to preserve, for at least two years:

> any records which [it] makes in the regular course of [its] business operation which relate to the payment of wages, wage rates, job evaluations, job descriptions, merit systems, seniority systems, collective bargaining agreements, description of practices or other matters which describe or explain the basis for payment of any wage differential to employees of the opposite sex in the same establishment, and which may be pertinent to a determination whether such differential is based on a factor other than sex.[120]

Fontenot does not identify any documents that she believes were made, or should have been made, in Safety Council's regular course of business on this issue, nor does she provide legal authority to support her interpretation that the regulation requires an employer to document the reason for a pay differential.[121] The plain language of the regulation requires an employer to "preserve *any* records which [it] makes in the regular course of business," not that the employer *must* make such records.[122]

---

[118] Rec. Doc. 188 at 15–17.

[119] *Id.* at 15–16.

[120] 29 C.F.R. § 1620.32(b), (c). The regulation also requires an employer to preserve "all records required by the applicable sections of 29 C.F.R. part 516." *Id.* Fontenot does not further describe what sections of 29 C.F.R. part 516 are "applicable" to the instant facts. *See* Rec. Doc. 188 at 16. A cursory review shows that part 516 governs payroll records and employee biographical data. *See e.g.*, 29 C.F.R. § 516.2.

[121] *See* Rec. Doc. 188 at 15–17.

[122] *See* 29 C.F.R. § 1620.32(b) (emphasis added).

The Court finds that this regulation, alone, does not support Fontenot's proposition that the "catch-all" defense of the EPA requires an employer to specifically and purposely compare an employee of one sex with any and all proper comparators of the opposite sex at the time it makes salary determinations. The Court also notes that Fontenot filed the instant lawsuit more than two years after she was hired as COO.[123] Thus, seemingly, the recordkeeping regulation would not have required Safety Council to maintain any records made in 2011 beyond the year 2013.[124]

Fontenot also seems to suggest that an employee's qualifications for a job are "merits" which should be considered under a "merit system" defense rather than under the "catch-all" defense, "a differential based on any other factor other than sex."[125] In support, Fontenot quotes one Fifth Circuit case which discussed merit systems and qualifications in the same paragraph.[126] However, Fontenot omitted the specific sentence in which the Fifth Circuit addressed employees' "qualifications" separately from employees' "relative merit."[127] The full passage suggests that the Fifth Circuit did not consider qualifications at the time of hiring to be "merits" under a merit system defense:

> At trial the hospital objected to the exclusion of testimony by the Director of Nursing Services as to the qualifications, potential, and value of each aide and orderly as she perceived them. As to qualifications at the time of hiring, the hospital failed to demonstrate the relevance of such factors as formal education to the duties the employees were called on to perform. As to relative merit, however, the Act specifically provides that unequal pay for equal work is justified if administered pursuant to a 'merit system.'[128]

---

[123] *See* Compl. (Rec. Doc. 1).

[124] 29 C.F.R. § 1620.32(c).

[125] Rec. Doc. 188 at 19.

[126] *Id.* at 21 (citing *Brookhaven Gen. Hosp.*, 436 F.2d at 726).

[127] *See id.*; *Brookhaven Gen. Hosp.*, 436 F.2d at 726.

[128] *Brookhaven Gen. Hosp.*, 436 F.2d at 726.

In a case considering the "catch-all" defense of the EPA, the Fifth Circuit stated that "[d]ifferent job levels, different skill levels, previous training and experience[,] all may account for unequal salaries in an environment free from discrimination,"[129] and several district courts within the Fifth Circuit have followed this statement of the law.[130] Thus, the Court is not persuaded that Safety Council's evidence as to Fontenot's and McCorquodale's experience should not have been considered under Safety Council's "catch-all" defense.

Fontenot also challenges the evidence to support Safety Council's defense of "negotiations."[131] However, as Safety Council does not contend that it paid Fontenot less due to negotiations, the Court will not consider whether evidence was sufficient to support a finding that the difference in pay was based on negotiations.

Accordingly, despite not explicitly considering any differences between Fontenot and McCorquodale at the time of setting Fontenot's salary, testimony was offered that: (1) in the summer of 2011, Safety Council was aware of McCorquodale's contractual salary and the overpayments he received, considering the recent investigation and board meetings on the subject; (2) Safety Council chose Fontenot to replace McCorquodale after he resigned; and (3) the Committee members were familiar with McCorquodale's experience, particularly that his experience was greater than Fontenot's. The Committee members also testified that they considered Fontenot's level of experience, her prior pay rate, and her increased responsibilities as COO when deciding the salary to offer her. Therefore, legally sufficient evidence exists for a

---

[129] *Plemer*, 713 F.2d at 1137, 1138 (quoting *Pouncy*, 668 F.2d at 803).

[130] *See e.g.*, *E.E.O.C. v. TXI Operations, L.P.*, 394 F. Supp. 2d 868, 878 (N.D. Tex. 2005); *Parr v. Nicholls State Univ.*, No. 09-3576, 2011 WL 838903, at *4 (E.D. La. Mar. 3, 2011).

[131] Rec. Doc. 188 at 23–25.

reasonable jury to find that the difference between McCorquodale's and Fontenot's pay[132] was based on their differences in experience, Fontenot's prior salary, and Fontenot's increased job responsibilities, all of which are factors other than sex.

## V. Conclusion

Evidence was introduced to support a finding that Safety Council paid Fontenot less than her male predecessor, McCorquodale, for two reasons. First, Safety Council believed that McCorquodale had overpaid himself and desired to correct the structure which allowed these excessive payments. Second, Safety Council paid Fontenot less considering the increase of responsibilities she would take on as COO, her previous salary, and her level of experience, while being familiar with the differences between Fontenot's experience level and McCorquodale's experience level. Accordingly, the Court finds that a legally sufficient evidentiary basis exists for a reasonable jury to find that the difference in pay between Fontenot and McCorquodale was based on factors other than sex. Because the Court finds support for the jury's verdict in favor of Safety Council on Fontenot's EPA claim, it need not consider any evidence as to the amount of damages submitted by Fontenot. Accordingly,

**IT IS HEREBY ORDERED** that Fontenot's "Renewed Motion for Judgment as a Matter of Law"[133] is **DENIED**.

New Orleans, Louisiana, this 29th day of August, 2018.

NANNETTE JOLIVETTE BROWN
CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

[132] To the extent any difference not accounted for by Safety Council's desire to correct the structure of the contract in light of overpayments to Fontenot's predecessor, McCorquodale.

[133] Rec. Doc. 186.